ALLIANCE FOR CHILDREN, INC., Plaintiff,

v.

CITY OF DETROIT PUBLIC SCHOOLS and Badriyyah Sabree, Defendants.

No. 06–15021.

United States District Court, E.D. Michigan, Southern Division.

Feb. 15, 2007.

Jonathan B. Frank, Jackier, Gould, Bloomfield Hills, MI, for Plaintiff.

Jerome R. Watson, Miller, Canfield, Detroit, MI, Audrey J. Anderson, Hogan & Hartson, Washington, DC, for Defendants.

### OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

LAWSON, District Judge.

The plaintiff, a Michigan corporation that provides "supplemental educational services," such as tutoring, to grammar and high school students, has filed the present action against the Detroit Public School District (DPS) and one of its employees alleging that the defendants wrongfully refused to include the plaintiff on an approved list of service providers. The seven-count complaint includes both federal and state law claims. The federal claims are based on the No Child Left Behind Act, the Due Process Clause, and the First Amendment. The defendants have moved to dismiss the entire complaint contending that it fails to state a cogniza-

ble claim. The Court heard oral argument from counsel for the parties on February 13, 2007 and took the motion under advisement. The Court now finds that the No Child Left Behind Act does not create a private right of action for the plaintiff, the plaintiff has not alleged a protectable interest under the Due Process Clause, and any retaliatory act alleged by the plaintiff occurred before the activity the plaintiff claims is protected by the First Amendment. The plaintiff, therefore, has failed to state a redressable claim under federal law. The Court will decline to exercise supplemental jurisdiction over the state law claims. Therefore, the motion to dismiss will be granted.

## I.

In order to "ensure that all children have a fair, equal, and significant opportunity to obtain a high-quality education," the No Child Left Behind Act, 20 U.S.C. § 6301 *et seq.*, contains provisions requiring local school districts that "fail to make adequate yearly progress" under plans developed by the State to pay for tutoring for low income students. The tutoring is referred to as "supplemental educational services," or SES. 20 U.S.C. § 6316(e).

According to the complaint, the plaintiff is a private company approved by the State of Michigan to provide SES on a contract basis. The plaintiff had a contract with DPS to provide SES during the 2005–2006 school year, during which it enrolled about 1,000 Detroit students. The plaintiff alleges that DPS terminated the contract without cause on February 13, 2006 and would not let the plaintiff provide SES for the rest of the school year, refused to pay the plaintiff for services that were provided before the contract was terminated, and refused to recognize the plaintiff as an approved provider for the 2006–2007 school year. However, a letter from the DPS, attached as exhibit E to the complaint, explains that the contract

was terminated because the plaintiff did not provide the services to students required under the contract and failed to pay its employees.

The plaintiff alleges that it tried to resolve these problems by having its attorney contact DPS. Correspondence exchanged in early November 2006 suggested to the plaintiff that perhaps DPS had changed its position and would recognize the plaintiff as a provider. The plaintiff therefore sent an employee to the DPS offices to retrieve information and materials concerning students in need. However, when the plaintiff's representative arrived, defendant Badryyah Sabree, the acting executive director of DPS's Office of Compliance, refused to provide the information and told the plaintiff's employee that DPS did not consider the plaintiff to be an approved provider.

The plaintiff states that the U.S. Department of Education has audited the State's department of education and identified flaws in DPS's method of administering the SES program, including the failure to enter into SES agreements with approved providers, and providing reasonable deadlines for requesting services. The plaintiff also alleges that the defendants are unfairly favoring certain providers over others. On October 27, 2006, an announcement was made at Southeastern High School that any student who failed a class could get credit for the class by enrolling for tutoring with a specific provider. Students were told that a bus would take them to the DPS Welcome Center after school to attend an open house scheduled for certain providers of SES. Three buses of students were taken to the Welcome Center and directed to a specific provider's table, where they signed agreements to be tutored by the provider. The students' parents were not present.

The complaint also alleges that the plaintiff complained to DPS about "violations that occurred during the 2005–2006 school year" and that "DPS conducted an investigation." Compl. ¶ 55. "As part of and as a result of the investigation, the DPS took further steps to impair Plaintiff's ability to provide Supplemental Educational Services and students' ability to obtain those services." Compl. ¶ 56.

Based on these allegations, the plaintiff has stated seven counts in its complaint, which are denominated as follows: breach of contract, tortious interference with contract and business relationships, violation of the No Child Left Behind Act, violation of due process, violation of fair and just treatment, violation of 42 U.S.C. § 1983, and defamation. According to the defendants, none of these claims as pleaded is viable.

## II.

Motions to dismiss are governed by Rule 12(b) of the Federal Rules of Civil Procedure and allow for dismissal for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). "The purpose of Rule 12(b)(6) is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true." *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir.1993). In reviewing a motion to dismiss under Rule 12(b)(6), the allegations in the complaint are taken as true and are viewed favorably to the non-moving party. *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir.1995); *Herrada v. City of Detroit*, 275 F.3d 553, 556 (6th Cir.2001). To survive a motion to dismiss, a complaint must contain "either direct or indirect allegations respecting all material elements to sustain a recovery under *some* viable legal theory." *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir.1993). The Court may consider only whether the allegations contained in the complaint state a claim for

which relief can be granted. *Roth Steel Prod. v. Sharon Steel Corp.*, 705 F.2d 134, 155 (6th Cir.1983). The motion shall be granted only if "no set of facts in support of [the plaintiff's] claim [ ] would entitle [the plaintiff] to relief." *Broyde v. Gotham Tower, Inc.*, 13 F.3d 994, 996 (6th Cir.1994).

## A.

■ In count three of the complaint, the plaintiff seeks declaratory and injunctive relief based on the defendants' purported violation of the No Child Left Behind Act. The defendants insist that the NCLBA confers no private right upon the plaintiff to bring an action, and they point out that every court to have considered the question whether the NCLBA creates a private right of action has answered that question in the negative. *See Fresh Start Academy v. Toledo Bd. of Educ.*, 363 F.Supp.2d 910 (N.D.Ohio 2005); *ACORN v. N.Y. City Dept. of Educ.*, 269 F.Supp.2d 338 (S.D.N.Y.2003); *Stokes ex rel. K.F. v. United States Dept. of Educ.*, 2006 WL 1892242 (D.Mass. July 10, 2006); *Blanchard ex rel Blanchard v. Morton Sch. Dist.*, 2006 WL 2459167 (W.D.Wash. Aug.25, 2006); *Coachella Valley Unified Sch. Dist. v. California*, 2005 WL 1869499 (N.D.Cal. Aug.5, 2005). This Court agrees.

Challenges based on whether federal programs can be privately enforced frequently arise in the context of legislation enacted pursuant to Congress's spending authority. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 279–82, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). Courts have held that such legislation can give rise to such rights enforceable under section 1983. *See Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990). In other circumstances, a right of action can be implied even when no state actor is involved, unlike here. *See, e.g.*

*Cannon v. Univ. of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (holding that a medical school applicant had right under Title IX of the Education Amendments of 1972 to pursue a private cause of action against private universities). But as the Supreme Court has observed, " '[i]n legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State.' " *Gonzaga Univ.,* 536 U.S. at 280, 122 S.Ct. 2268 (quoting *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 28, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981)).

The Supreme Court has held that the critical question that is determinative of whether such legislation can be enforced privately is "whether or not Congress intended to confer individual rights upon a class of beneficiaries." *Gonzaga Univ.,* 536 U.S. at 285, 122 S.Ct. 2268. In *Gonzaga University,* the Supreme Court acknowledged that confusion may have resulted from the conflation of its cases dealing with whether a statute created an implied private right of action with those cases determining whether there were private rights enforceable under section 1983. The Court held, however, that "in either case we must first determine whether Congress intended to create a federal right." 536 U.S. at 283, 122 S.Ct. 2268. "For a statute to create such private rights, its text must be 'phrased in terms of the persons benefitted.' " *Id.* at 284, 122 S.Ct. 2268 (citing *Cannon,* 441 U.S. at 692, n. 13, 99 S.Ct. 1946). The Court stated that the statute unambiguously must confer "rights," not merely "benefits." *Id.* at 283, 122 S.Ct. 2268. "If Congress wishes to create new rights enforceable under § 1983, it must do so in clear and unambiguous terms." *Id.* at 290, 122 S.Ct. 2268. "Where the text and structure of a

statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action." *Id.* at 286, 122 S.Ct. 2268.

■ The plaintiff in this case points the Court to Sixth Circuit precedent applying *Gonzaga University* to certain sections of the Medicaid Act wherein private rights were found enforceable under section 1983. In *Harris v. Olszewski,* 442 F.3d 456 (6th Cir.2006), for instance, the court applied the following test to statutory language commanding that state Medicaid plans "must ... provide that [ ] any individual eligible for medical assistance (including drugs) may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required (including an organization which provides such services, or arranges for their availability, on a prepayment basis), who undertakes to provide him such services," 42 U.S.C. § 1396a(a)(23):

In ascertaining "whether Congress intended to create a federal right" in the freedom-of-choice provision, ... the Court has directed us to look at three factors, *see Blessing v. Freestone,* 520 U.S. 329, 340–41, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997); *see also Westside Mothers v. Haveman,* 289 F.3d 852, 862–63 (6th Cir.2002). "First, Congress must have intended that the provision in question benefit the plaintiff." *Blessing,* 520 U.S. at 340, 117 S.Ct. 1353. In answering this initial inquiry, courts look for a statutory right or *"individual entitlement,"* *Gonzaga,* 536 U.S. at 287, 122 S.Ct. 2268, that is "unambiguously conferred," *id.* at 283, 122 S.Ct. 2268, by the use of "rights-creating language," *id.* at 284 n. 3, 122 S.Ct. 2268. An "aggregate focus" unconcerned "with whether

the needs of any particular person have been satisfied," *id.* at 288, 122 S.Ct. 2268 (internal quotation marks omitted), is insufficient; the statute must be "phrased in terms of the persons benefitted," *id.* at 284, 122 S.Ct. 2268, and use "individually focused terminology," *id.* at 287, 122 S.Ct. 2268. "Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence." *Blessing,* 520 U.S. at 340–41, 117 S.Ct. 1353 (internal quotation marks omitted). "Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms." *Id.* at 341, 117 S.Ct. 1353.

*Harris,* 442 F.3d at 461. If a plaintiff can make these three showings, "a rebuttable presumption [arises] that the right is enforceable under § 1983," *Harris,* 442 F.3d at 461 (quoting *City of Rancho Palos Verdes v. Abrams,* 544 U.S. 113, 120, 125 S.Ct. 1453, 161 L.Ed.2d 316 (2005)), which the defendant can defeat by showing that the statute's comprehensive enforcement scheme is incompatible with individual enforcement.

The court concluded that the Medicaid "statute uses the kind of 'individually focused terminology' that 'unambiguously confer[s]' an 'individual entitlement' under the law." *Harris,* 442 F.3d at 461 (quoting *Gonzaga,* 536 U.S. at 283, 122 S.Ct. 2268). Other courts have followed suit in the Medicaid context. *Wilder,* 496 U.S. at 508, 110 S.Ct. 2510; *Westside Mothers v. Haveman,* 289 F.3d 852, 863 (6th Cir.2002); *Barton v. Summers,* 293 F.3d 944, 953 (6th Cir.2002); *Markva v. Haveman,* 168 F.Supp.2d 695, 704 (E.D.Mich.2001), *aff'd* 317 F.3d 547 (6th Cir.2003); *Beeker v. Olszewski,* 415 F.Supp.2d 734 (E.D.Mich. 2006). The statutory language and context in this case do not measure up, however, in the case of a vendor seeking to provide statutorily-mandated services under the NCLBA.

The purpose of the No Child Left Behind Act, 20 U.S.C. § 6301 *et seq.,*

> is to ensure that all children have a fair, equal, and significant opportunity to obtain a high-quality education and reach, at a minimum, proficiency on challenging state academic achievement standards and state academic assessments.

20 U.S.C. § 6301. As noted earlier, the Act requires local educational agencies (local school districts) that "fail to make adequate yearly progress" under plans developed by the state to pay for tutoring for low income students. The tutoring is referred to as "supplemental educational services," or SES. The Act certainly contains mandatory language:

> In the case of any school described in paragraph (5), (7), or (8) of subsection (b) of this section, *the local educational agency* serving such school *shall,* subject to this subsection, *arrange for the provision of supplemental educational services* to eligible children in the school from a provider with a demonstrated record of effectiveness, that is selected by the parents and approved for that purpose by the State educational agency in accordance with reasonable criteria, consistent with paragraph (5), that the State educational agency shall adopt.

.    .    .    .    .

(3) Agreement

> In the case of the selection of an approved provider by a parent, *the local educational agency shall enter into an agreement with such provider.* Such agreement shall—
>
>> (A) require the local educational agency to develop, in consultation with parents (and the provider chosen by

the parents), a statement of specific achievement goals for the student, how the student's progress will be measured, and a timetable for improving achievement that, in the case of a student with disabilities, is consistent with the student's individualized education program under section 1414(d) of this title;

(B) describe how the student's parents and the student's teacher or teachers will be regularly informed of the student's progress;

(C) provide for the termination of such agreement if the provider is unable to meet such goals and timetables;

(D) contain provisions with respect to the making of payments to the provider by the local educational agency; and

(E) prohibit the provider from disclosing to the public the identity of any student eligible for, or receiving, supplemental educational services under this subsection without the written permission of the parents of such student.

.   .   .   .   .

(12) Definitions

In this subsection—

(A) the term "eligible child" means a child from a low-income family, as determined by the local educational agency for purposes of allocating funds to schools under section 6313(c)(1) of this title;

(B) the term "provider" means a nonprofit entity, a for-profit entity, or a local educational agency that—

(i) has a demonstrated record of effectiveness in increasing student academic achievement;

(ii) is capable of providing supplemental educational services that are consistent with the instructional program of the local educational agency and

the academic standards described under section 6311 of this title; and

(iii) is financially sound; and

(C) the term "supplemental educational services" means tutoring and other supplemental academic enrichment services that are-

(i) in addition to instruction provided during the school day; and

(ii) are of high quality, research-based, and specifically designed to increase the academic achievement of eligible children on the academic assessments required under section 6311 of this title and attain proficiency in meeting the State's academic achievement standards.

20 U.S.C. § 6316(e) (emphasis added). However, the Court does not find that this mandatory language unambiguously creates in the service provider a clear right to enforce claims against a school district. Mandatory language-in this case "shall ... arrange for the provision of supplemental educational services"; and "shall enter into an agreement with such provider"—is not enough. The statute also must be directed at a class of individual beneficiaries. *See Caswell v. City of Detroit Hous. Comm'n*, 418 F.3d 615, 620 (6th Cir.2005) (holding that a rent subsidy provision under the Housing Act of 1937 stating that a "monthly assistance payment for a family receiving assistance under this subsection *shall* be determined" did not create an individual right in the tenant enforceable under section 1983 as to the amount of *his* subsidy).

In *Fresh Start Academy v. Toledo Board of Education*, 363 F.Supp.2d 910 (N.D.Ohio 2005), the plaintiff was a provider of supplemental educational services seeking recognition by a local school board, just like the plaintiff here. "Fresh Start claims it is a state-approved provider of SES and that it has applied to the

Board seeking 'entry and access to the available federal and state funds that are designed for tutorial services via the No Child Left Behind Act.'" *Fresh Start Academy v. Toledo Bd. of Educ.*, 363 F.Supp.2d 910, 912–13 (N.D.Ohio 2005). The court dismissed the case, finding that the Act "provides no procedure for individual entities like Fresh Start to enforce its requirements." *Fresh Start*, 363 F.Supp.2d at 914.

Applying *Gonzaga University*, and citing *ACORN v. N.Y. City Dept. of Educ.*, 269 F.Supp.2d 338 (S.D.N.Y.2003), the court concluded that Congress did not intend to create an individual federal right in enacting the NCLBA for three reasons. The Act does not create "rights-creating language"; the Act is focused on children as a whole, not specific children or individual SES providers; and the Act provides for enforcement by the Secretary of Education. The court correctly observed that the mandatory language in the Act applied to the school districts, not vendors furnishing services that the school districts were compelled to provide. The court also noted that the statutory text had an "aggregate focus," not an individual focus. Finally, the legislation contained its own enforcement mechanism authorizing the Secretary of Education to "withhold funds from noncompliant states, 20 U.S.C. § 6311(g)(2), indicates that Congress did not intend to provide for piecemeal enforcement by individuals across the country." *Fresh Start*, 363 F.Supp.2d at 916.

The Court finds this reasoning persuasive, compliant with the rule laid down in *Gonzaga University*, and consistent with the text and context of the statute. There is no language in the statutory provisions quoted above that demonstrates Congress's intent to "unambiguously confer[ ]" on the plaintiff an "individual entitlement." *Harris*, 442 F.3d at 461 (quoting *Gonzaga*, 536 U.S. at 287, 122 S.Ct. 2268). In *Har-*

*ris*, the language found to create such a right in Medicaid recipients required state Medicaid plans to "provide that ... any individual eligible for medical assistance (including drugs) may obtain such assistance from any institution ... who undertakes to provide him such services." 42 U.S.C. § 1396a(a)(23). This language plainly gives Medicaid recipients a specific right. The NCLBA, by comparison, does not focus on SES providers in the same way or confer on them any rights. It only creates an obligation on the school district vis-à-vis students and parents to arrange for tutoring to eligible children and enter into contracts with tutoring providers. It does not unambiguously confer on such providers an individual entitlement. "The Act ... focuses on the entity regulated and does not confer a benefit or entitlement upon an individual, as Title VI and Title IX, for example, do by providing that 'no person ... shall be subjected to discrimination.'" *Fresh Start*, 363 F.Supp.2d at 916. Congress knows how to create rights, and it did not do so here.

■ The defendants also argue that the statute does not create individual rights in students or parents, citing *ACORN v. N.Y. City Dept. of Educ.*, 269 F.Supp.2d 338 (S.D.N.Y.2003), and the plaintiff's argument that it may enforce those rights on their behalf should fail. The Court need not decide whether individual parents or students can enforce the NCLBA, however, because the plaintiff has no standing to do so in any event. In *Kowalski v. Tesmer*, 543 U.S. 125, 130, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004), the Supreme Court enforced the general rule that a party "must assert his own legal rights and interests." *Id.* at 129, 125 S.Ct. 564 (quoting *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). In that case, criminal defense attorneys brought suit under section 1983 alleging

that a state court's practice of denying appellate counsel following a guilty plea was unconstitutional. The Supreme Court concluded that the attorneys did not have standing. The Court acknowledged an exception may be made if "the party asserting the right has a 'close' relationship with the person who possesses the right" and "there is a 'hindrance' to the possessor's ability to protect his own interests," *id.* at 130, 125 S.Ct. 564 (quoting *Powers v. Ohio,* 499 U.S. 400, 411, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991)). However, the attorneys did not meet the closeness requirement because they were "rely[ing] on a future attorney-client relationship with as yet unascertained Michigan criminal defendants." *Id.* at 130, 125 S.Ct. 564. They could not demonstrate a hindrance because an indigent criminal defendant has "open avenues to argue that denial [of appellate counsel] deprives him of his constitutional rights." *Id.* at 131, 125 S.Ct. 564. Because the attorneys could not meet these requirements, they did not have standing.

In this case, assuming that students or parents could enforce the Act individually, the plaintiff does not have standing to assert such rights on their behalf because the plaintiff cannot meet the closeness and hindrance requirements of *Kowalski.* The plaintiff does not have any relationship at all with the students who allegedly are being denied their rights under the Act. Like the attorneys in *Kowalski,* the plaintiff is relying on a "future [ ] relationship" with "as yet unascertained" eligible students. *Id.* at 130, 125 S.Ct. 564. Nor can the plaintiff show that these students cannot protect their own interests.

The Court concludes that no private right of action is conferred upon SES providers under the NCLBA, and the claim premised thereon must be dismissed.

**B.**

■ Count four of the plaintiff's complaint contains the following allegations:

50. The state and federal constitutions prohibit the deprivation of life, liberty or property without due process of law. US Const, Am V, Am XIV; Const 1963, art 1, § 17.

51. Defendants violated Plaintiff's substantive and procedural due process rights.

52. Plaintiff requests that the Court award Plaintiff damages in an amount in excess of $1 million, plus costs, interest and attorney fees.

Compl. ¶¶ 50–52. The defendants argue that these paragraphs do not state a claim for relief. At oral argument, plaintiff's counsel asserted that it seeks only to advance a procedural due process claim. The plaintiff contends the defendants violated its procedural due process rights by wrongfully terminating the 2005–2006 contract and then unilaterally refusing to enter into a contract for the following year even though federal law required it to do so, thereby depriving it of a property interest. The plaintiff also posits that the defendants' actions "besmirched" its name by giving others the impression that the plaintiff is not a legitimate provider of tutoring services, thereby depriving it of a liberty interest.

The Fourteenth Amendment to the Constitution prohibits State and local governments from "depriv[ing] any person of life, liberty, or property, without due process of law." When analyzing an alleged procedural due process violation, the court must determine first whether a protected property or liberty interest exists; absent an interest, no right to due process is present. *Singfield v. Akron Metro. Hous. Auth.,* 389 F.3d 555, 565 (6th Cir.2004). Second the court asks what process is due. *Ibid; see also Johnston–Taylor v. Gannon,* 907

F.2d 1577, 1581 (6th Cir.1990). The formality of the process due under federal law "depends upon the importance of the interest" at stake. *Farhat v. Jopke,* 370 F.3d 580, 595 (6th Cir.2004). "[T]he Court usually has held that the Constitution requires some kind of a hearing before the State deprives a person of liberty or property." *Zinermon v. Burch,* 494 U.S. 113, 127, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). However, "where predeprivation process would have been impossible or impractical," *Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n,* 442 F.3d 410, 433 (6th Cir.2006), "the Court has held that a statutory provision for a postdeprivation hearing, or a common-law tort remedy for erroneous deprivation, satisfies due process," *Zinermon,* 494 U.S. at 128, 110 S.Ct. 975.

"A protected liberty interest goes beyond freedom from bodily restraint; it includes the right of the individual to contract." *United of Omaha Life Ins. Co. v. Solomon,* 960 F.2d 31, 34 (6th Cir.1992). "[T]he due process clause forbids arbitrary deprivation of liberty where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him." *Ibid.* (quotation marks omitted). To make out a due process claim based on injury to one's reputation or good name, five elements must be satisfied:

> First, the allegedly stigmatizing statements must be made in connection with the loss of a governmental right, benefit, or entitlement. There is no constitutional liberty interest in one's reputation standing alone. Second a plaintiff alleging an injury to a liberty interest must show that the defendant made defamatory statements that would foreclose his freedom to take advantage of other employment opportunities. Third, the stigmatizing statements or charges must be made public. Fourth, the plaintiff must claim that the charges made against him

were false. And, lastly, the public dissemination must have been voluntary. *Med Corp., Inc. v. City of Lima,* 296 F.3d 404, 414 (6th Cir.2002) (internal quotation marks and citations omitted). " 'A charge that merely makes a plaintiff less attractive to other employers but leaves open a definite range of opportunity does not constitute a liberty deprivation.' " *Ibid.* (quoting *Ludwig v. Bd. of Trs.,* 123 F.3d 404, 410 (6th Cir.1997)).

"To establish the existence of a constitutionally protected property interest, [the plaintiff] must demonstrate that it had 'a legitimate claim of entitlement,' not 'a mere unilateral expectation' in the interest said to be interfered with." *TriHealth, Inc. v. Bd. of Comm'rs,* 430 F.3d 783, 792 (6th Cir.2005) (quoting *Bd. of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). Such property interests are created "not by the Constitution, but by independent sources such a state law." *Ibid.* "When a liberty interest has been created, the due process clause acts to insure that the state-created right is not arbitrarily abrogated." *Bills v. Henderson,* 631 F.2d 1287, 1291 (6th Cir. 1980); *see also Beard v. Livesay,* 798 F.2d 874, 876 (6th Cir.1986) (observing that "a State creates a protected liberty interest by placing substantive limitations on official discretion").

The plaintiff in this case cites *United of Omaha Life Ins. Co. v. Solomon,* 960 F.2d 31, 34 (6th Cir.1992), in support of its claim that it was deprived of a property interest. That case involved the State of Michigan's request for bids for a contract to provide administrative services for the State's employee life insurance plan. The State received four bids but did not open the one from Royal Maccabees Life Insurance Company because it did not meet certain requirements. The budget department recommended that the State award the

contract to United of Omaha, who had the lowest of the bids that were opened. Before the contract was awarded, Maccabees complained that it did meet the bid requirements and that the requirements were too stringent. The budget department reviewed the complaint and agreed, recommending that the requirements be rewritten and the contract rebid. However, United of Omaha sued and obtained a temporary restraining order to stop the State from rebidding the contract. United claimed that the State's failure to follow its guidelines deprived the plaintiff of a liberty interest and violated procedural due process. The court of appeals reversed the district court's TRO, finding that the state "neither precluded United from entering into other contracts with the State, nor besmirched United's good name. Hence, we find no deprivation of a protected liberty interest occurred." *United of Omaha*, 960 F.2d at 34. Nor did the plaintiff have a protected property interest in the contract. The court concluded that United's claim was that of a "disappointed bidder." A disappointed bidder must actually be awarded a contract or show "that local rules limit the discretion of state officials as to whom the contract should be awarded" to make out a due process claim. *United of Omaha*, 960 F.2d at 34. United could show neither.

In *Club Italia Soccer and Sports Org., Inc. v. Shelby Twp.*, 470 F.3d 286 (6th Cir.2006), also cited by the plaintiff, the Soccer Club claimed that the local government violated its due process rights by accepting a proposal from a competitor without giving the plaintiff the chance to submit a bid. The plaintiff asserted a liberty interest in the right to bid. The district court dismissed the case, and the court of appeals affirmed. The court concluded that the plaintiff had no liberty interest to be protected. "The Due Process Clause cannot be used to execute a judicial coup over the handling of government contracts under the guise of protecting liberty interests. Rather, a state actor's decision to deny a plaintiff a single contract only amounts to a restraint on business when those 'actions ... preclude [Plaintiff] from entering into other contracts with the State, [or] besmirch [Plaintiff's] good name.'" *Club Italia*, 470 F.3d at 297 (quoting *United of Omaha*, 960 F.2d at 34). The plaintiff did not establish a property interest because it was never awarded the contract and the county had unlimited discretion to award the contract under state law.

The defendants argue that *Ferencz v. Hairston*, 119 F.3d 1244 (6th Cir.1997), provides controlling authority under the facts of this case. There, the plaintiffs were remodeling contractors on a list of contractors from which the City of Toledo would solicit bids for projects funded by federal Community Development Block grants. The city would take bids from three contractors on the list, but the property owner actually selected the contractor. An audit mandated by the United States Department of Housing and Urban Development revealed problems with the plaintiffs' permits and workmanship. The city removed the plaintiffs from the contract list, and local newspapers published the names of the suspended contractors and the reasons. After the plaintiffs corrected the problems, they were still not returned to the list. The plaintiff alleged a due process violation, claiming they had a property interest in remaining on the bid list. The court rejected this claim because "being on the list entitled the plaintiffs to nothing more than the opportunity to make the lowest and 'best' bid, a bid that could be rejected by the homeowner even if selected by the city." A spot on the list did not guarantee the plaintiffs a contract. Therefore, exclusion from the list implicated no property interest.

In the present case, the plaintiff alleges that the defendants' refusal to recognize it as an approved provider of SES violated its procedural rights. It is not clear from the complaint how that action implicated the Due Process Clause. Although the plaintiff's complaint does assert that "Defendant Sabree knowingly made a false statement that Plaintiff was not approved to provide Supplemental Educational Services and has falsely disparaged Plaintiff's ability to provide Supplemental Educational Services," nowhere does the complaint allege that the defendants' actions have "foreclose[d][its] freedom to take advantage of other employment opportunities." *Med Corp., Inc.*, 296 F.3d at 414. Nor does it appear that the plaintiff could make such a claim. The defendants' decision to remove the plaintiff from the list of providers does not prevent the plaintiff from doing business. " 'A charge that merely makes a plaintiff less attractive to other employers but leaves open a definite range of opportunity does not constitute a liberty deprivation.' " *Ibid.* The plaintiff also cannot make out a deprivation of its right to contract. The defendants have not "precluded [the plaintiff] from entering into other contracts with[in] the State." *United of Omaha*, 960 F.2d at 34.

Nor can the plaintiff establish a protected property interest. This case tracks very closely with *Ferencz v. Hairston.* That case rejected a claim that the plaintiff had a property interest in being on a list of service providers that "entitled the plaintiffs to nothing more than the opportunity to" enter into contracts. Being on the provider list "did not guarantee any actual employment or payments." *Ferencz*, 119 F.3d at 1247–48. Therefore the plaintiff's "right" to be named on the provider list does not amount to a property interest protected by the Due Process Clause. Likewise, the contract between the plaintiff and DPS did not provide the plaintiff with an entitlement. The contract allows the plaintiff to provide tutoring services "as may be required by a Parent or an eligible student." Compl. Ex. D, Contract at C. If no parents chose the plaintiff as a provider, the plaintiff is entitled to nothing under the contract. The contract "did not guarantee any actual employment or payments."

Because the plaintiff has not alleged a protectable liberty or property interest, the count of the complaint alleging deprivation of procedural due process must be dismissed.

## C.

Count six of the plaintiff's complaint contains the claim that the defendants violated the plaintiff's First Amendment rights by retaliating against it for speaking out against the termination of its contract for the 2005–2006 school year. After incorporating the preceding allegations, the complaint states:

59. Defendants were deliberately indifferent to and deprive Plaintiff of its constitutional and statutory rights under color of law.

60. Defendants' actions were pursuant to official policy.

61. Plaintiff was engaged in a constitutionally protected activity under the First Amendment.

62. Plaintiff was subjected to adverse action and deprived of some benefit.

63. The protected speech was a "substantial" or "motivating factor" in the adverse action.

64. Plaintiff requests that the Court award Plaintiff damages in an amount in excess of $1 million, plus costs, interest, and attorney fees.

Compl. ¶ 59–64. The defendants assert that these paragraphs do not state a claim for relief because they are completely de-

void of any factual allegations that support the claim.

The plaintiff responds that DPS refused to enter into an agreement for the 2006–2007 school year in retaliation for the plaintiff's complaint about DPS's treatment of the plaintiff in the 2005–2006 school year. The plaintiff admits "that its complaint is not clear" on this claim and "requests leave to amend if necessary." Pl.'s Resp. Br. at 12 n. 3.

The Supreme Court has held that those who contract with the government have First Amendment protections similar to government employees. "The similarities between government employees and government contractors with respect to this issue are obvious. The government needs to be free to terminate both employees and contractors for poor performance, to improve the efficiency, efficacy, and responsiveness of service to the public, and to prevent the appearance of corruption." *Bd. of Cty. Comm'rs v. Umbehr*, 518 U.S. 668, 674, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996).

■ To prevail on a First Amendment retaliation claim, the plaintiff must plead and prove that (1) it "was engaged in a constitutionally protected activity; (2) the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights." *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir.2000). Speech is constitutionally protected if it addresses a matter of public concern. *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir.2003).

■ In light of these elements, the Court sees two problems with the plaintiff's First Amendment retaliation claim. First is the nature of the alleged protected conduct. In identifying the protest

against the termination of the 2005–2006 contract, the plaintiff has not explained how those statements amount to a matter of public concern. Rather, the objection to the interruption of its business relationship with the DPS and its students appears to be the equivalent of "the quintessential employee beef." *Jackson v. Leighton*, 168 F.3d 903, 911 (6th Cir.1999). The task of determining whether speech by a government employee or contractor relates to a matter of public concern is not always an easy one, although the Supreme Court has outlined some bright-line rules. *See, e.g. Garcetti v. Ceballos*, —— U.S. ——, ——, 126 S.Ct. 1951, 1960, 164 L.Ed.2d 689 (2006) ("We hold that when employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."). The Sixth Circuit has identified factors, which this Court has discussed, that are useful in close cases:

Matters of public concern include speech that "relat[es] to any matter of political, social, or other concern to the community." *Rodgers*, 344 F.3d at 596 (quoting *Connick*, 461 U.S. at 146, 103 S.Ct. 1684). Such speech calls attention to the functioning of government, misconduct of public employees or officials, or breaches of public trust. *See Connick*, 461 U.S. at 148, 103 S.Ct. 1684; *Rodgers*, 344 F.3d at 596 *Brandenburg*, 253 F.3d at 898. However, mere mention of a public issue alone is not determinative of whether the speech is protected. When distinguishing public complaints about official misconduct from the "quintessential employee beef," the court must examine the context in which it was made. The court of appeals summarized the task in *Farhat*: "our circuit has distilled the 'public concern' test by stating that the court must determine:

the 'focus' of the speech; 'the point of the speech in question'; 'to what purpose the employee spoke'; 'the intent of the speech'; or 'the communicative purpose of the speaker.'" *Farhat*, 370 F.3d at 592 (citations omitted). Also, the court of appeals has noted, "even if a public employee were acting out of a private motive with no intent to air her speech publicly ... so long as the speech relates to matters of 'political, social, or other concern to the community,' as opposed to matters 'only of personal interest,' it shall be considered as touching upon matters of public concern." *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1052 (6th Cir.2002). *Shimkus v. Hickner*, 417 F.Supp.2d 884, 913 (E.D.Mich.2006). Of course, this task is best undertaken after a full development of the facts, something that has not occurred at the present stage of the lawsuit. However, the plaintiff has an obligation to plead *some* facts in the complaint from which it might be inferred that the speech touched upon a matter of public concern in order to state a claim. The Court has found none. Rather, the only reasonable inference that can be drawn from the allegations is that the plaintiff objected to the termination of its own contract, which is a personal, not a public, matter beyond the scope of First Amendment protection. *Connick v. Myers*, 461 U.S. 138, 154, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (requiring examination of the context and content of speech so that "principles of free expression" are not "confused with the attempt to constitutionalize the employee grievance").

The second problem relates to the sequence of events, that is, the timing of the retaliatory conduct in relation to the alleged protected activity. According to the complaint, the plaintiff's protest came *after* the contract termination. The plaintiff identifies the retaliatory conduct as the failure to enter into a new contract for the next school year, but that stance by the DPS in essence was the same as in the previous year: the DPS believed that the plaintiff no longer was a qualified or responsible provider of SES, and it did not want to deal with the plaintiff. As a matter of logic, the DPS's conduct could not have been motivated by the plaintiff's protest because the DPS staked out its position before the alleged protected activity occurred. That principle was explained by the court of appeals in *Workman v. Frito-Lay, Inc.*, 165 F.3d 460, 470 (6th Cir.1999), which considered a claim of retaliation under the Americans with Disabilities Act:

> By the time plaintiff filed the EEOC charge in late November 1993, she had already concluded from her discussions with Paschal that he would not allow her to return to work or offer a reasonable accommodation.... As the district court emphasized, defendant's position concerning plaintiff's ability to return to work with or without accommodation remained essentially the same before and after she filed the EEOC charge. Thus, there was no evidence that plaintiff suffered any adverse action as a result of having filed the EEOC charge, and the district court properly granted judgment as a matter of law to defendant on this claim.

*Id.* at 470 (Guy, J. concurring).

The same may be said of the allegations in the complaint in this case. The DPS's position essentially remained unchanged after the alleged protected activity, and therefore there are no facts stated in the complaint from which an inference could be drawn that "the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights." *Leary*, 228 F.3d at 737.

Acknowledging a lack of clarity in its pleadings, the plaintiff mentioned in a footnote in its response brief that it may

want they opportunity to amend its complaint. Although requests to amend should be freely given under Federal Rule of Civil Procedure 15(a), the requesting party must at least file a motion to that effect. The Sixth Circuit has condemned the practice of incorporating such informal requests in opposition briefs. *PR Diamonds, Inc. v. Chandler,* 364 F.3d 671 (6th Cir.2004). The court explained:

> In this case, Plaintiffs failed to follow the proper procedure for requesting leave to amend. They did not actually file a motion to amend along with an accompanying brief, as required by the local rules governing practice before the district court. Instead, they simply included the following request in their brief opposing the Defendants' motions to dismiss: "Alternatively, in the event the Court grants any part of the Defendants' motions to dismiss, plaintiffs respectfully request leave to amend their Complaint." As the D.C. Circuit has found, "a bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which amendment is sought, cf. Federal Rule of Civil Procedure 7(b)-does not constitute a motion within the contemplation of Rule 15(a)." *Confederate Mem'l Ass'n v. Hines,* 995 F.2d 295, 299 (D.C.Cir.1993), quoted in *D.E.&J. Ltd. P'ship v. Conaway,* 284 F.Supp.2d 719, 751 (E.D.Mich.2003). This Court's disfavor of such a bare request in lieu of a properly filed motion for leave to amend was made clear in *Begala v. PNC Bank, Ohio, N.A.,* 214 F.3d 776, 784 (6th Cir. 2000): "What plaintiffs may have stated, almost as an aside to the district court in a memorandum in opposition to the defendant's motion to dismiss is also not a motion to amend." As the *Begala* decision reasoned in affirming the district court's dismissal of the plaintiff's complaint with prejudice in that case,

> Had plaintiffs filed a motion to amend the complaint prior to th[e] Court's consideration of the motions to dismiss and accompanied that motion with a memorandum identifying the proposed amendments, the Court would have considered the motions to dismiss in light of the proposed amendments to the complaint.... Absent such a motion, however, Defendant was entitled to a review of the complaint as filed pursuant to Rule 12(b)(6). *Plaintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies* of the complaint and then an opportunity to cure those deficiencies.

214 F.3d at 784 (emphasis in original).

*Id.* at 699 (6th Cir.2004). The court likewise believes that the plaintiff has not properly sought leave to amend its complaint.

### D.

■ The plaintiff also has stated four claims under state law, including a breach of contract claim. The Court has subject matter jurisdiction over the state law claims under the supplemental jurisdiction statute because those claim form part of the same controversy as the federal claims. *See* 28 U.S.C. § 1367(a). However, section 1367 also provides:

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). When a plaintiff's federal claims have been dismissed on the merits, the question of whether to retain jurisdiction over the state law claims rests within the Court's discretion. *Blakely v. United States*, 276 F.3d 853, 860 (6th Cir. 2002). Thus, pursuant to section 1367(c), the Court has the discretion to decline to exercise supplemental jurisdiction over state law claims in this case. *Weeks v. Portage County Executive Offices*, 235 F.3d 275 (6th Cir.2000) (observing that section 1367(c) "permit[s] the district court to decline to exercise supplemental jurisdiction when that court has dismissed all of the claims over which it has original jurisdiction").

The plaintiff suggests that its breach of contract claim furnishes an independent basis of jurisdiction because it raises a substantial question of federal law. At oral argument, counsel for the plaintiff explained that the contract allows termination "for *any reason* authorized under Federal or State law." Compl. Ex. D, Contract § C(E)(5). He reasons that the NCLBA must be interpreted to determine whether the contract termination was lawful, and therefore a federal question is embedded in the state law claim over which the Court can exercise jurisdiction under 28 U.S.C. § 1331.

In *Eastman v. Marine Mechanical Corp.*, 438 F.3d 544 (6th Cir.2006), the Sixth Circuit explained that " 'arising under' jurisdiction for state-law claims based on an interpretation of federal law can be found in section 1331 only when there is 'not only a contested federal issue, but a substantial one'; and 'federal jurisdiction is consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331.' " *Id.* at 552 (quoting

*Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 313–14, 125 S.Ct. 2363, 162 L.Ed.2d 257 (2005)). The definition of "substantial ... question" is not crystal clear; but at the very least, "[a] 'substantial' federal question involves the interpretation of a federal statute that actually is in dispute in the litigation and is so important that it 'sensibly belongs in federal court.' " *Eastman*, 438 F.3d at 552.

Good arguments can be made for the idea that the NCLBA ought to be interpreted by federal courts because of "the experience, solicitude, and hope of uniformity that [resort to] a federal forum offers." *Grable & Sons*, 545 U.S. at 312, 125 S.Ct. 2363. However, in this case, the plaintiff has not described adequately how an interpretation of the NCLBA would be required in adjudicating his breach of contract claim. The defendants gave as a reason for terminating the 2005–2006 contract the plaintiff's "fail[ure] to provide tutorial services to DPS students required under the Contract," and "fail[ure] to pay its employees in a timely manner as required under Section C(A)(13)(a) of the Contract." Compl. Ex. E, Termination Ltr. If the contract requires those actions, then the plaintiff may litigate the truth or falsity of those claims without the need to construe the NCLBA. If instead that plaintiff alleges that the NCLBA would not allow those contractual provisions, then the claim would not be for breach of contract but would require an action to enforce the Act itself. Either way, no breach of contract claim under the facts of this case requires an interpretation of the NCLBA. Therefore, there can be no substantial federal question involved, and no independent basis to exercise federal jurisdiction.

■ The remaining claims for tortious interference with contract and business relationships, violation of the fair and just

treatment clause in the state constitution, and defamation will require the interpretation and application of state law. "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The dismissal of the claim over which the federal court had original jurisdiction creates a presumption in favor of dismissing without prejudice any state-law claims that accompanied it to federal court. *Blakely,* 276 F.3d at 863. The Court believes it is appropriate to decline the exercise of supplemental jurisdiction over the state law claims now that the plaintiff's federal claims will be dismissed. The state law claims, therefore, will be dismissed without prejudice.

## III.

The Court finds that there is no private right of action for contract services vendors such as the plaintiff under the No Child Left Behind Act, the plaintiff has not stated redressable claims for violation of the First Amendment or the Due Process Clause, and supplemental jurisdiction ought not be exercised over the state law claims.

Accordingly, it is **ORDERED** that the defendants' motion to dismiss [dkt # 9] is **GRANTED.**

It is further **ORDERED** that counts three, four, and six of the complaint are **DISMISSED WITH PREJUDICE,** and counts one, two, five and seven of the complaint are **DISMISSED WITHOUT PREJUDICE.**